Filed 2/25/15  Zigman-Shields Gen. Contractors v. Kirk Paving CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ZIGMAN-SHIELDS GENERAL CONTRACTORS, INC., | D062854 |
| Plaintiff, Cross-defendant and Appellant, | (Super. Ct. No. 37-2010-00060415-CU-BC-NC) |
| v. | |
| KIRK PAVING, INC., | |
| Defendant, Cross-complainant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Earl Maas III, Judge.  Affirmed in part; reversed in part; and remanded with directions.

Boudreau Williams and Jon R. Williams for Plaintiff, Cross-defendant, and Appellant.

Law Offices of Gary M. Letchinger and Gary M. Letchinger for Defendant, Cross-complainant, and Respondent.

General contractor Zigman-Shields General Contractors, Inc. (Contractor) sued its paving subcontractor, Kirk Paving, Inc., alleging Kirk Paving performed defective work. Kirk Paving cross-complained for amounts due under the contract. After a four-day bench trial, the court found each party proved certain of its claims, and awarded Kirk Paving a net recovery of $8,351.13 plus attorney fees and costs.

Contractor appeals, contending the court erred in ruling that it breached the contract by failing to pay Kirk Paving for: (1) paving work known as an F-cap installation; and (2) paving work on a portion of the project known as the north parking lot. We agree with the first contention and disagree with the second. We remand for a limited retrial on the issue of damages relating to Kirk Paving's F-cap installation work.

### FACTUAL AND PROCEDURAL SUMMARY

*Subcontract Agreement*

The Evangelical Formosan Church (Church) retained Contractor to perform work at its facility. In August 2008, Contractor and Kirk Paving entered into a written subcontract agreement (Subcontract Agreement) in which Kirk Paving agreed to perform subcontract work on two matters: (1) grade and pave the Church parking areas, which consisted of north and south parking lots with an intersecting causeway; and (2) apply a thin asphalt top layer (known as F-cap) to a concrete base on a public street next to the Church parking lot.

*Parking Lot Work*

After Kirk Paving completed the parking lot work, various portions of the asphalt surface were uneven and had drainage issues, particularly in the south parking lot. Kirk

2

Paving performed repair work, but Contractor was not satisfied with this work and refused to pay Kirk Paving for the work until it completed additional work to correct the problems. Kirk Paving believed the work was satisfactory and met contract standards, and refused to perform any additional work without payment for the work already performed. Contractor thereafter paid another subcontractor to complete the work on the north and south parking lots, and the connecting causeway.

*F-cap Work*

F-cap is a type of asphalt that is composed of sand and oil and serves as a top coating on a street surface. At the time of the Subcontract Agreement, the City of San Diego (City) required F-cap to be installed on public streets and City approval was necessary for the finished installation. In the Subcontract Agreement, Kirk Paving agreed to perform the F-cap installation work on a street adjacent to the parking lots, and agreed to satisfy City requirements.

On the day the F-cap was to be installed, Kirk Paving waited until about 10:00 a.m. to begin because the product could not be installed until the ground temperature reached 60 degrees. This meant that Kirk Paving did not finish the work until 3:30 p.m., shortly before the City reopened the street to traffic. Within a few days, it became apparent that the F-cap installation had failed, as it was peeling and was obviously deficient. The City refused to approve the work.

Contractor then requested that Kirk Paving reinstall the F-cap work in a satisfactory manner. Kirk Paving responded that the F-cap problem arose from a defect in the product and expressed substantial doubt as to whether F-cap would ever be

3

effective in this location.  But Kirk Paving agreed to reinstall the F-cap if Contractor (and/or the City) placed additional funds in escrow and agreed to pay for all the work (the first and second installation) even if the second installation failed.  Contractor refused to agree to this, and after numerous attempts to reach a resolution, Contractor retained another subcontractor to perform the work.  After the second subcontractor completed the F-cap installation, the City approved the work.

*Complaint and Cross-complaint*

Contractor then filed a breach of contract complaint against Kirk Paving, alleging it had paid $185,870.04 to Kirk Paving, but that Kirk Paving had performed "defective and substandard work" and refused to make requested repairs.  Contractor alleged Kirk Paving had abandoned the project and/or failed to pay its material suppliers.  Contractor claimed it had sustained damages of $62,368.86.

Kirk Paving cross-complained, alleging a breach of contract claim against Contractor.  Kirk Paving alleged it substantially and satisfactorily performed all of its required work under the Subcontract Agreement, and that Contractor breached the Subcontract Agreement by refusing to pay the contract balance.

*Trial*

In February 2012, the court conducted a four-day bench trial.  Several witnesses testified, including the president of each party (Joshua Zigman for Contractor and Jon Kirk for Kirk Paving), other party representatives, the owner representative, and expert witnesses.  Numerous photographs of the work and other documentary evidence were

4

admitted into evidence. The main focus of the trial was on the parking lot paving issues and the F-cap installation work.

On the parking lot paving issues, the evidence was conflicting as to whether the parking lot work (and repair work) was performed satisfactorily, and if not, which party caused the problems. Additionally, the evidence showed two types of claimed problems. First, the parking lot in some areas was not even and had "undulations" (high and low points). Second, there was a claimed problem with water drainage, sometimes resulting in water remaining on the property in small ponds known as "bird baths."

On the F-cap installation work, it was undisputed that Kirk Paving's installation failed by "unraveling" and peeling almost immediately and that it did not pass the City's inspection. But the evidence was conflicting as to the cause of the failure. Kirk Paving's president testified that the F-cap failed because of a faulty design and that "an F-cap is not meant to be applied on locations where you have excessive traffic index." He also stated that the City opened the street to traffic too soon. The City inspector testified the installation failed because Kirk Paving did not apply the product in the correct manner (perpendicular to the street) and/or that the area was opened to traffic before the material sufficiently adhered to the ground. Kirk Paving's expert, Harry George, testified that the F-cap failed because "[t]raffic . . . [was] opened up prematurely," and/or that the area may have heavy traffic loads that are inappropriate for the F-cap material.

Regarding damages on the parking lot and F-cap issues, Kirk Paving argued and presented evidence that it satisfactorily performed all the work under the contract and/or that any defects were outside its control, and thus it was entitled to $50,393.13, the total

5

unpaid balance for the work performed. Contractor countered by arguing and presenting evidence that Kirk Paving was not entitled to this amount because its work was defective and it was responsible for the defective work. Contractor sought damages as compensation for payments it made to a second subcontractor to complete the work and for related costs and contract penalties.

*Court's Ruling*

At the conclusion of the trial, the parties submitted written closing arguments and then, at the court's request, supplemental briefing. After considering the evidence and arguments, the court issued a statement of decision, concluding that each of the parties proved some of its claims. In the decision, the court initially observed that "Neither party disputed the existence of a valid contract, or its terms." The court then identified the applicable legal standard: "Where [Contractor] proved by a preponderance of the evidence that the work performed by [Kirk Paving] was substandard, the withholding [of contract payments] was appropriate. However, where [Contractor] failed to prove by a preponderance of the evidence that the work was substandard, the withholding was a breach of contract by [Contractor]."

In applying this standard, the court stated its conclusions were based "mainly on the credibility of the witnesses," and discussed its witness evaluations, including that it found the Contractor's president, Zigman, to be "combative" and that his propensity to be argumentative on cross-examination "reflected poorly on his credibility." The court also found Kirk Paving's president to be "combative," but said his testimony was credible and "more persuasive" than Zigman's testimony. The court found Kirk Paving's expert, Harry

6

George, to be the "most persuasive" witness, and identified various other credible witnesses, including Michael Tan, the owner representative, and Bob Hargraves, Kirk Paving's production manager.

The court then discussed its conclusions on the two primary issues (the F-cap work and the parking lot asphalt work).

On the F-cap issue, the court stated "the court is persuaded the problems with the 'F-Cap' were caused by the early opening of the area to traffic, and this was not within the control of [Kirk Paving].  As such, [Kirk Paving] was in compliance with the contract, and [Contractor's] withholding of payment was in breach of contract."

On the parking lot issue, the court found:  (1) insufficient evidence that there were problems with water ponding in any area of the parking lot; (2) Kirk Paving breached the contract with respect to its paving work in the "swale" area and south parking lot because there were numerous " 'undulations' " in the pavement; and (3) Kirk Paving did not breach the contract with respect to its work in the north parking lot.

In explaining these conclusions, the court stated it found "the photographs to be helpful, but also troubling" and discussed at length the conflicting evidence regarding the water drainage issues.  The court then stated that "[b]ased upon the photographs provided and the evidence submitted, the court is not persuaded, by a preponderance of the evidence, that the . . . pictures of water draining off the parking lot shortly after the water was applied, somehow suggests that the water was not draining.  This argument and evidence was not persuasive.  In this regard, [Kirk Paving] was not in breach of contract, and [Contractor's] withholding of payment was improper."  But the court stated it was

7

"persuaded, by a preponderance of the evidence" that the asphalt work "provided near the swale" and "the undulations in the *south parking lot*" were unacceptable and that Kirk Paving "was in breach of contract" regarding its work in these areas. (Italics added.)

Regarding damages, the court found Kirk Paving proved entitlement to $50,393.13, reflecting the entire unpaid balance for its work on the contract. The court found Contractor proved damages of $42,042, consisting of: (1) $32,305 paid to a second paving contractor to repair the south parking lot and the connecting causeway; plus (2) $2,730 paid to a third party for a survey of the south parking lot; plus (3) $7,007, reflecting 20 percent additional damages under a contract provision providing for such damages in the event the contractor is "required to complete" the subcontractor's work.

In the final judgment, the court awarded Kirk Paving $50,393.13 and awarded Contractor $42,042, and thus determined Kirk Paving was entitled to a net recovery of $8,351.13. The court further awarded Kirk Paving $55,613.63 in costs and attorney fees pursuant to a prevailing-party contractual provision in the Subcontract Agreement.

Contractor appeals.

## DISCUSSION

### I. *Review Standards*

Contractor contends the court erred in finding in Kirk Paving's favor regarding its work on the F-cap installation and the north parking lot. In considering these contentions, we apply two different review standards.

First, assessing the parties' respective obligations under the Subcontract Agreement is a matter of contract interpretation. In the absence of extrinsic evidence on

8

the meaning of the contract provisions, contract interpretation is a question of law. (See *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 799.)

Second, whether either party breached obligations under the Subcontract Agreement is a question of fact, to which we apply the familiar substantial evidence test. (*Ash v. North American Title Co.* (2014) 223 Cal.App.4th 1258, 1268.) " 'Substantial evidence . . . is not synonymous with "any" evidence.' Instead, it is ' " 'substantial' proof of the essentials which the law requires." ' [Citations.]" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) We view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences and resolve all conflicts in its favor. (*Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1129.)

Under these review standards, we first set forth the relevant contractual provisions, and then analyze Contractor's arguments that the court erred in its findings regarding Kirk Paving's F-cap installation work and north parking lot work.

## II. *Subcontract Agreement Provisions*

Under the Subcontract Agreement, "If within one (1) year of . . . completion . . . any work by [Kirk Paving] is found to be defective, [Kirk Paving] shall correct it at [Kirk Paving's] expense promptly after receipt of written notice from [Contractor] to do so."

Additionally, "If in the judgment of [Contractor] the work of [Kirk Paving] is not proceeding in accordance with the Contract Documents or [Kirk Paving] has breached any other provision of this contract, [Contractor] may, after giving twenty-four (24) hours

9

notice to [Kirk Paving] of its breach, proceed to have the work done in the manner most expedient to [Contractor] and charge the cost including any incidental expenses and those additional costs set out in the agreement to [Kirk Paving]. . . . In the event [Contractor] is required to complete the work of [Kirk Paving] in accordance with the provisions of this agreement, [Kirk Paving] agrees to reimburse [Contractor] for all costs and expenses including consequential damages plus an additional twenty percent (20%) of costs and expenses as overhead."

Further, "[Contractor] may withhold payment . . . in part in order to protect the [Contractor] from loss because of . . . defective work not remedied . . . unsatisfactory progress of the Work . . . [or] failure to obtain approvals required by any authority having jurisdiction . . . ." "Notwithstanding the foregoing, [Contractor] may refuse to make payment on any invoice or Certificate of Payment . . . for any default under the Contract Documents. The [Contractor] shall not be deemed in default by reason of withholding payment while any of such defaults remain uncured."

### III.  *F-cap Installation*

Contractor contends the court erred in concluding that it breached the Subcontract Agreement by declining to pay Kirk Paving for the defective F-cap installation and by finding that Kirk Paving did not breach the contract by refusing to repair this defective installation.

At trial, most of the issues regarding the F-cap installation were undisputed. It was undisputed that the F-cap installed by Kirk Paving needed replacement because it did not adhere to the pavement and began peeling shortly after the installation, and that the

10

City refused to approve the work because it was defective. The undisputed evidence also showed Kirk Paving was willing to perform the necessary repair work only if Contractor placed funds in an escrow account that compensated Kirk Paving for the initial and second installation even if the second installation failed. It was also undisputed that Contractor declined this offer and retained a second contractor to perform a proper installation of the F-cap; this second installation received City approval; and Contractor paid the second subcontractor for this work.

But one issue *was* disputed: the cause of the initial F-cap failure. Upon considering this disputed evidence, the court made a factual finding that the F-cap installation failed because the street was opened to traffic immediately after the installation, *and* that Kirk Paving had no control over the street opening. Contractor argues that even assuming it is true that the defective F-cap installation was not Kirk Paving's fault, Kirk Paving was obligated under the contract terms to replace it at its own cost.

This argument has merit. The contract unambiguously provides that Kirk Paving is obligated to correct any defects at "SUBCONTRACTOR'S expense" and that Contractor "may withhold payment . . . in part in order to protect [Contractor] from loss because of . . . defective work not remedied" or "failure to obtain approvals required by any authority having jurisdiction . . . ." Kirk Paving does not point to any language in the Subcontract Agreement providing that it was excused from correcting or repairing paving defects if a third party's actions (here, the City's decision to open the street for traffic immediately after the work was performed) was the actual cause of the problem.

11

On appeal, Kirk Paving does not challenge that it was responsible for correcting the F-cap problem under the Subcontract Agreement, but argues that the "Trial Court clearly had the power to set aside any contract provisions that produce[d] an unjust and unfair result." Kirk Paving asserts that "it would be unjust to hold [it] responsible for the action of another party entirely outside of [its] control. If Kirk [Paving] were responsible for the actions of the City, the result would 'undermine the sense of security for individual rights.' "

Kirk Paving's argument is inconsistent with well-settled contract principles. Where, as here, two business entities execute a contract defining their rights and responsibilities, a court cannot disregard the parties' agreement merely because the court may believe the agreement terms constituted a bad bargain or the outcome was "unjust." Our sole judicial function is to enforce a contract according to its terms. (Civ. Code, § 1638; see *Tanner v. Title Ins. & Trust Co.* (1942) 20 Cal.2d 814, 824; *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 656; *Schwab v. Bridge* (1915) 27 Cal.App. 204, 207.) Where the language is clear, there is no room for judicial interpretation or modification of the agreement. (*Tanner, supra*, 20 Cal.2d at p. 824; *Carr Business Enterprises, Inc. v. City of Chowchilla* (2008) 166 Cal.App.4th 25, 30; see *Jones v. Pollock* (1950) 34 Cal.2d 863, 866.) It is not the role of courts to rule on the wisdom, desirability, or propriety of a particular contractual bargain.

Kirk Paving contends a court may refuse to enforce a contract term if the term violates public policy, citing *Safeway Stores, Inc. v. Retail Clerks Internat. Assn.* (1953) 41 Cal.2d 567 and *Altschul v. Sayble* (1978) 83 Cal.App.3d 153. We agree with this

12

general principle, but there is no basis to find the Subcontract Agreement violated public policy. There is no public policy providing that a contractor, rather than a subcontractor, must bear the risk of loss resulting from a factor outside the parties' control. This matter is a proper subject of contract negotiations. The circumstances here are unlike those of *Altschul*, in which a court found unenforceable an attorney referral fee contract that has "long been condemned and disapproved" by the legal profession (*Altschul, supra*, at p. 160); and *Safeway Stores* where the court upheld a preliminary injunction to enjoin certain union strike activities that were not in "furtherance of any proper labor objective" and thus violated the state's labor relations policies (*Safeway Stores, supra*, at pp. 574-576).

We also reject Kirk Paving's argument that we may alternatively uphold the court's determination based on an unconscionability defense. First, Kirk Paving never made this argument in the court below. He directs us to his trial brief attached as an appendix to his respondent's brief. However, materials attached to a brief do not become part of the appellate record without proper designation or proper augmentation of the record. (See Cal. Rules of Court, rule 8.204(d).) Moreover, the discussion in the trial brief relates solely to the parking lot issue and whether Kirk Paving should be held responsible for defects in the parking lot. There was nothing at trial, including the written closing arguments, suggesting that Kirk Paving was asserting an unconscionability defense to the Contractor's breach of contract claim regarding the F-cap issue. In its statement of decision, the court stated that neither party disputed the validity of the contract, and neither party challenged this statement.

Additionally, there is no factual or legal support showing that the Subcontract Agreement provisions were unconscionable. California unconscionability law requires an evaluation of procedural and substantive elements. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (2012) 55 Cal.4th 223, 246-247.) "The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. [Citations.] . . . [¶] . . . [¶] . . . Both procedural unconscionability and substantive unconscionability must be shown, but 'they need not be present in the same degree' and are evaluated on ' "a sliding scale." ' [Citation.] '[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' [Citation.]" (*Ibid.*)

The only evidence presented regarding the contract negotiations or the formation of the agreement was Zigman's testimony that Kirk Paving did not request any changes to its standard subcontract agreement before it was signed and Jon Kirk's testimony that he did not negotiate any of the "fine print or boilerplate language." There was no evidence the standard provisions were oppressive or surprising and/or that the parties had unequal bargaining power. Further, there was no evidence that the provisions were overly harsh or one-sided. "[U]nconscionability doctrine is concerned not with 'a simple old-fashioned bad bargain' [citation], but with terms that are 'unreasonably favorable to the more powerful party.' [Citation.]" (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th

14

1109, 1145.) There was no evidence that the Subcontract Agreement was unreasonably unfavorable to Kirk Paving such that it was unenforceable under California law.

IV. *Parking Lot Paving Work*

Contractor also challenges the court's conclusion that it was not entitled to damages for its repairs to the north parking lot. The court made a factual finding that Kirk Paving's work on the south parking lot was defective, but that the work on the north parking lot was satisfactory. Contractor's challenge to this factual finding is reviewed on a substantial evidence review standard. Applying this standard, we find this challenge lacks merit.

First, Contractor forfeited its right to challenge the court's factual findings by failing to designate all the relevant evidence and discuss all the relevant facts. When an appellant contends the evidence is insufficient to support a finding, the appellant must set forth all the evidence material to that finding, including the evidence unfavorable to its position. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) "[T]he appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment." (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.) An appellant must state fully, with transcript citations, the evidence (including exhibits) claimed to be insufficient to support the trial court's findings. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.) "An appellate court will consider the sufficiency of the evidence to support a given finding only after a party tenders such an issue together with a fair summary of the evidence bearing on the challenged finding, particularly including

evidence that arguably *supports* it." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409-410.)

In this case, Contractor relies solely on its own evidence to summarize the facts related to the parking lot paving issues. In so doing, Contractor ignores much of the other relevant evidence, including the testimony of Jon Kirk and numerous photographs of the parking lot areas and witness testimony about those photographs. The court specifically found these photographs helpful, but Contractor did not designate these photographs to be part of the appellate record, or discuss the photographs in its appellate briefs. Kirk Paving's expert witness George (who the court found particularly credible) was shown several photographs and offered opinions regarding the work on various portions of the parking lot. However, because Contractor did not designate those photographs, we do not have the benefit of evaluating this evidence. By failing to summarize all the evidence, including the evidence that supported Kirk Paving's case, the asserted challenge is waived. (See *Foreman & Clark, supra*, 3 Cal.3d at p. 881.)

Further, on our review of the record before us, we are satisfied there is sufficient evidence to support the court's factual conclusion that Kirk Paving's work on the north parking lot was satisfactory, particularly after Kirk Paving repaired the problem areas. Jon Kirk testified that the parking lot had "smooth and uniform[ ] pavement as required by the contract." He acknowledged that although there were initially some problems, his company performed repairs that remedied many of these problems. He also said Kirk Paving was willing to continue to perform repairs, but could not do so until it received payments for the work already performed.

16

Additionally, the property owner representative, Tan, testified that he drove over the *south* parking lot and found substantial undulations, but there was no evidence he drove over the *north* parking lot. Contractor's superintendent (Robert Evert) testified that the south parking lot had "unevenness" and there were "undulations" throughout the lot, but acknowledged that the north parking lot "appeared fairly decent" (except for water issues) and that it "didn't seem to be as bad as the [south] parking lot."[1] The evidence supported that the problems with the south parking lot were more substantial than the problems with the north parking lot.

On this record, the court could make a reasonable distinction between the north and south parking lots and conclude Contractor did not prove the north parking lot pavement work was defective.

Contractor also argues the court erred because it used the "wrong legal criteria" in determining damages because it improperly focused on the "efficacy of water testing" and " 'bird baths.' " (Capitalization and boldface font omitted.) The Subcontract Agreement required Kirk Paving to accomplish two tasks: (1) provide a "pavement surface, when completed [that is] smooth, dense, well bonded, and of uniform texture and appearance"; and (2) ensure "[a]ll areas shall drain and be free of ponded or standing water." In its statement of decision, the court stated that although Kirk Paving did not breach its contract to provide the area free from "ponded or standing water" *or* to provide

---

[1] Although Evert's reference was to the north parking lot, Evert later clarified that he was intending to refer to the north parking lot as the lot with fewer problems. He agreed that the "south lot was the worst of the two."

17

smooth pavement in the north parking lot, Kirk Paving did breach its contract with respect to the south parking lot because of the many " 'undulations' " in the south parking lot. These findings reflect that the court understood Kirk Paving was required to provide a proper surface and ensure proper water drainage. The record does not support that the court improperly focused solely on the water drainage issues, or believed the claimed drainage problems were the only issues before it.

We are likewise unpersuaded by Contractor's reliance on the evidence showing the property owner (and the project architect) found the entire parking lot to be unsatisfactory. The evidence showed that Tan (the Church's project manager) rejected the entire parking lot, and requested that all the work be redone. However, the owner's conclusions do not establish as a matter of law that the work did not meet contract requirements. In determining whether Kirk Paving breached the contract, the court was entitled to consider whether the owner's determination was reasonable and to view all the evidence, including the photographs and the witness testimony, to evaluate whether the parking lot (or any portion of it) met the contract standards. Although it found Tan's conclusions were reasonable with respect to the south parking lot, the court did not find sufficient evidence to show the north parking lot was defective. The court, as the trier of fact, was entitled to reach these conclusions.

Additionally, the fact that Contractor's expert testified that Kirk Paving's work did not meet the industry standard of care does not mean the court was required to accept his opinion with respect to the entire parking lot. A trier of fact is not bound by the opinion of an expert witness. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 204;

18

*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923.)  A factfinder may disregard the expert's opinion, even if uncontradicted, and draw its own factual inferences.  The court is entitled to accept all or part of a witness's testimony, reject an uncontradicted expert opinion, and draw its own reasonable inferences from the evidence. We do not reweigh the evidence nor do we substitute our own reasonable inferences for those drawn by the trier of fact.

## DISPOSITION

Judgment is reversed with directions to conduct a limited retrial only on the issues of damages (if any) for Kirk Paving's breach of contract relating to the F-cap installation and/or the amount the Contractor was permitted to withhold for the defective F-cap job. After the limited retrial, the court shall reevaluate the record to determine whether any modification to the attorney fees award is warranted.  In all other respects, the court's findings are affirmed and shall be incorporated into the new final judgment.  The parties to bear their own costs on appeal.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

McDONALD, J.

19